UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-23818-RAR

**TRISTAN CRAIG**, *on behalf of herself and all others similarly situated*,

    Plaintiff,

v.

**NOVA SOUTHEASTERN UNIVERSITY**,

    Defendant.
_____/

## ORDER GRANTING MOTION TO DISMISS

    This case presents the next chapter of ongoing litigation seeking to hold Nova Southeastern University liable for breach of contract or unjust enrichment following its campus closure at the start of the COVID-19 pandemic. The Amended Complaint presently before the Court seeks to recover a portion of fees Plaintiff paid to the University for the January 2020 through May 2020 semester ("Winter Semester"). For the reasons that follow, Defendant's Motion to Dismiss, [ECF No. 30], is **GRANTED**, and Plaintiff's Amended Complaint, [ECF No. 28], is **DISMISSED** *with prejudice*.[1]

## BACKGROUND

    Plaintiff Tristan Craig brings this class action lawsuit against Defendant Nova Southeastern University ("NSU" or "University") on behalf of all University students who paid certain fees for the school's Winter Semester, from January through May 2020. Am. Compl. ¶ 1. NSU is a private University in Broward County Florida. *Id.* ¶ 15. The University suspended classes on March 13,

---

[1] Defendant filed its Motion to Dismiss, [ECF No. 30], on October 4, 2022. Plaintiff filed her Response in Opposition to Defendant's Motion, [ECF No. 35], on November 4, 2022. Defendant filed a Reply, [ECF No. 36], on November 29, 2022. Accordingly, the Motion is ripe for ruling.

Page **1** of 15

2020 and began providing courses online starting on or around March 23, 2020 with no campus activities, facilities, or in-person educational services. *Id.* ¶ 3. The University did not refund students the fees paid for the Winter Semester after it implemented virtual education. *Id.*

Plaintiff was an undergraduate student during the Winter Semester and graduated in May 2020. *Id.* ¶ 11. Plaintiff paid a total of $2,391.00 in what Plaintiff refers to as "Mandatory Fees" for the Winter Semester. *Id.* ¶ 12. The fees Plaintiff paid include: (1) NSU Student Services Fee of $500; (2) Science Lab Fee Chemistry B of $80; (3) Science Lab Fee of $80; (4) "PVA Music Fee" of $265; (5) Insurance Fee of $1,336; (6) Graduation Fee of $100; and (7) Registration Fee of $30. *Id.* Plaintiff alleges that these Mandatory Fees were "for in-person educational services, experiences, opportunities, and other related collegiate services and access to facilities." *Id.* ¶ 14.

This Court's ruling in another related case, *Ferretti v. Nova Southeastern University*, is an "essentially identical action" involving "substantially similar facts," "nearly identical claims," and "substantially the same parties" and governs the scope of permissible claims in this matter. *See* Order Granting in Part and Denying in Part Plaintiff's Motion to Lift Stay and Motion for Leave to File First Amended Complaint ("Order Lifting Stay") [ECF No. 26] (adopting *Ferretti v. Nova Se. Univ., Inc.*, 604 F. Supp. 3d 1330 (S.D. Fla. 2022) (*Ferretti II*)).[2] In *Ferretti II*, the Plaintiff— a different but similarly situated NSU student— "asserted that he and putative Class Members contracted with Defendant for live on-campus instruction and access to campus facilities in the Winter 2020 term." *Ferretti II*, 604 F. Supp. 3d at 1334. There, the complaint alleged students contracted with NSU for live, in-person classes in exchange for tuition and fees, and for access to campus activities, facilities, resources, and services in exchange for separately itemized fees. *Id.* The complaint further alleged that NSU breached its contract with students for in-person education

---

[2] *Ferretti II* was the second Motion to Dismiss this Court ruled on in *Ferretti*. Previously, the Court issued an Order Denying Motion for Dispositive Relief Under Florida Statute Section 768.39. *See Ferretti v. Nova Se. Univ., Inc.*, 586 F. Supp. 3d 1260, 1263 (S.D. Fla. 2022) ("*Ferretti I*").

by suspending all in-person classes and switching to online course delivery. *Id.* The complaint also alleged that NSU breached its contract for campus activities and facilities through the distinct action of cancelling or closing access to its facilities, events, and services. *Id.* In *Ferretti II*, the complaint alleged one count of breach of contract and one count of unjust enrichment. Defendant NSU moved to dismiss both counts.

This Court dismissed most, but not all, of Ferretti's complaint. Beginning with the breach of contract claim, this Court held that there was no contract for principally or exclusively in-person, on-campus course delivery between the University and its students. *Id.* at 1337. The Court acknowledged, "[u]nder Florida law, a private university's relationship with its students is an implied-in-fact contract arising from the university's rules, regulations, regimen, and publications at the time of enrollment." *Id.* at 1334 (citing *Jallali v. Nova Se. Univ., Inc.*, 992 So. 2d 338, 342 (Fla. 4th DCA 2008)). Ferretti cited the course delivery summary, which states: "Face-to-face classes may also include some online instruction in addition to regular classroom instruction. Some assignments may be administered through internet-based sites associated with class textbooks or through the university's online course management system. Instructors will explain specific requirements for participation in online components." *Id.* Based on this language, the Court concluded that the contractual language unambiguously provided for flexibility in the method of its course delivery. *Id.* Thus, by teaching the semester partly in person and partly online, NSU did exactly what it said it might do. *Id.*

However, at that juncture, the same could not be said for the fees Plaintiff alleged he paid in exchange for access to in-person activities and resources on campus. Unlike the language regarding course delivery, neither Plaintiff nor Defendant could point to specific unambiguous language in NSU's publications regarding payment of fees in exchange for live access to campus. The Court held, "where neither party can establish unambiguous terms, a factual inquiry is

Page 3 of 15

necessary to determine whether the parties' contract contemplated access to campus activities, facilities, resources, and services in exchange for separately itemized fees." *Id.*

Regarding the unjust enrichment claim, the Court held that generally, Plaintiff may proceed with an unjust enrichment claim pled in the alternative to a breach of contract claim. *Id.* at 1338. Since the Court found a valid implied-in-fact contract which contemplated that NSU may hold an unspecified portion of face-to-face classes online, Plaintiff could not maintain an unjust enrichment claim on that issue. *Id.* But since the Court found no unambiguous terms creating a valid contract for live campus access, it would have been premature on that record to dismiss Plaintiff's unjust enrichment claim as to the lack of access to campus activities, facilities, resources, and services. *Id.*

Accordingly, the Court dismissed both counts *with prejudice* "as to any claim for tuition, as well as any claim for fees to the extent they were paid in exchange for in-person, on-campus classroom instruction," and the Court dismissed *without prejudice* and with leave to amend "any claim for separately itemized fees to the extent they were paid in exchange for access to campus activities, facilities, resources, and services." *Id.* at 1339. Plaintiff Ferretti elected not to amend his complaint.

Instead, after its ruling in *Ferretti II*, this Court lifted the stay of this case for the limited purpose of allowing Plaintiff Craig to file an Amended Complaint based on the *Ferretti II* ruling and allowing NSU to answer or move to dismiss. Order Lifting Stay ¶ 1. The Court adopted its ruling in *Ferretti II* and allowed Craig to "file an Amended Complaint in which Plaintiff is limited to asserting only any claim(s) for separately itemized fees to the extent they were paid in exchange for access to campus activities, facilities, resources, and services." *Id.* ¶ 6. That is the Amended Complaint the Court considers here, which Defendant now moves to dismiss.

Thus, the Court is left to determine whether Craig's Amended Complaint pleads sufficient facts to allege a contract between Craig and the University for separately itemized fees paid in exchange for access to campus activities, facilities, resources, and services. The Court concludes the Amended Complaint fails to do so and dismisses the Amended Complaint *with prejudice*.

## LEGAL STANDARD

Defendant raises its Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(f). Mot. at 1. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When evaluating a Rule 12(b)(6) motion to dismiss, the court must accept well-pleaded factual allegations as true and draw all inferences in favor of the plaintiff. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017).

## ANALYSIS

Defendant NSU moves to dismiss both of Plaintiff's claims in this action: breach of contract (Count I) and unjust enrichment (Count II). Mot. at 2. The Court addresses each Count in turn.

### I. Breach of Contract

The Court previously stated the relevant law in *Ferretti II*. "The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)). "[W]here the contract . . . terms are unambiguous, a court may properly consider a motion to dismiss for failure to state a claim for breach" of contract. *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1312 (S.D. Fla. 2014). "Contract interpretation principles under Florida law require [courts] to look first at the words used on the face of the contract to determine whether that contract is ambiguous. It is well settled that the actual language

used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Rose v. M/V "Gulf Stream Falcon"*, 186 F.3d 1345, 1350 (11th Cir. 1999) (internal citations omitted); *see also GE Med. Sys. S.C.S. v. SYMX Healthcare Corp.*, No. 18-20922, 2021 WL 821433, at *11 (S.D. Fla. Mar. 4, 2021) (noting that it is well settled that "[w]hen interpreting a contract, the court must first examine the plain language of the contract for evidence of the parties' intent").

Under Florida law, a private university's relationship with its students is an implied-in-fact contract arising from the university's rules, regulations, regimen, and publications at the time of enrollment. *Jallali*, 992 So. 2d at 342. As this Court has previously recognized, the terms of this implied-in-fact contract "may be derived from university publications such as the student handbook and catalog." *Ferretti I*, 586 F. Supp. 3d at 1270 (citing *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 929 (11th Cir. 2013); *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1357 (M.D. Fla. 2021)).

Plaintiff's Amended Complaint cites NSU's publications including the University Website and the 2019–2020 Student Handbook as evidence of the implied-in-fact contract between Plaintiff and NSU. *See* Am. Compl. ¶¶ 28–33. Defendant also cites the 2019–2020 Undergraduate Student Catalog, the Student Enrollment Agreement, the Aetna Student Health Plan, and the Aetna Student Health Website. *See* Mot. Ex. A–E, [ECF Nos. 30-1, 30-2, 30-3, 30-4, 30-5]. Because these publications are central to Plaintiff's Amended Complaint and thus ripe for consideration, the Court may examine their plain language to determine whether their relevant provisions establish unambiguous terms that support or refute Plaintiff's claims for breach of contract. *See Starship Enters. of Atlanta, Inc. v. Coweta Cnty.*, 708 F.3d 1243, 1252 n.13 (11th Cir. 2013).

Defendant argues that Plaintiff has not pleaded a promise for separately itemized fees in exchange for access to specific campus activities, resources, and services and that the plain

language of the referenced publications contradict Plaintiff's allegations. Mot. at 7. In response, Plaintiff argues that the plain language of the title of each fee speaks for itself as to what the fee promises. Resp. at 4. Plaintiff further states, "evincing each fees purpose [sic], the promissory language and marketing provided throughout Defendant's official policy documents make clear that the students are to receive *something* in exchange for the monies paid" and that "the language plainly identifies the specific promises made by the University to provide in-person and on-campus access." *Id.* (emphasis in original).

The Court "granted leave to file an Amended Complaint in which Plaintiff is limited to asserting only any claim(s) for separately itemized fees to the extent they were paid in exchange for access to campus activities, facilities, resources, and services." Order Lifting Stay ¶ 6. Accordingly, the Court looks to the University's publications for unambiguous language as to whether each separately itemized fee is tied to providing Students with access to certain facilities. The Court will address each fee individually.

### A. Student Health Insurance Fee

The Court begins with the fee most obviously unrelated to campus access: the student health insurance fee of $1,336. The University's publications show that this fee provided students with health insurance coverage regardless of their location and with no tie to any campus facility. As Defendant correctly notes, the University's Tuition and Fee Information webpage states that "[a]ll NSU students are required to maintain adequate health insurance." Mot. at 8 (citing Ex. A, Tuition and Fee Information). Both the Student Catalog and the Student Enrollment Agreement signed by Plaintiff state: "NSU requires all students to carry adequate health insurance coverage. Therefore, students will automatically be enrolled in the NSU Student Health Insurance Plan, and their student accounts will be charged when they register for classes." *Id.* (citing Ex. B, Student Catalog at 7; Ex. C, Student Enrollment Agreement). Moreover, the insurance plan expressly

provides, "Aetna Student Health gives you access to care by working closely with your school and with a network of doctors, hospitals, pharmacies and specialists *throughout the country*." *Id.* at 13, (citing Ex. E, Aetna Student Health Screenshot) (emphasis added). The insurance plan also provides a non-exclusive list of potential providers for students to consider, including numerous providers not located on NSU's campus. *Id.* at 13–14, (citing Ex. D, Insurance Plan at 2–8). The Court concludes that this language is unambiguous; the student health insurance fee Plaintiff paid was not in exchange for *access* to an on-campus facility or resource that Defendant failed to provide. Plaintiff paid for nation-wide health insurance, and Plaintiff has not pled she did not receive nation-wide health insurance.

### B. *Registration and Graduation Fees*

Next, the Court addresses the pre-semester registration fee and the fee Plaintiff paid as a graduating student. The University's published material unequivocally indicates that students did not pay these fees in exchange for in-person access to campus. The University's webpage, titled Tuition and Fee Information, identifies several "University-wide Fees." *Id.* at 6 (citing Ex. A, Tuition and Fee Information). The webpage provides a chart titled "2019-2020 Fees," and it lists "Registration Fee (per semester)" as $30. The webpage does not promise access to in-person classes simply by paying a fee to register.

Likewise, Plaintiff has failed to point to any facts or documents supporting her contention that the University promised her "an in-person commencement" in exchange for the Application for Degree Fee (referred to by Plaintiff in the Amended Complaint as the "Graduation Fee"). *See* Am. Compl. ¶ 57. Defendant, however, identifies language to the contrary. The Student Catalog states that "[t]here is *no fee* for participating in Commencement . . . ." Mot. at 14, (citing Ex. B, Student Catalog at 60) (emphasis added). The Student Catalog further states, "[t]he following conditions are also required: . . . Submission of the online degree application form and payment of

the $100 fee, preferably no later than the last semester. A degree cannot be evaluated for completion until the degree application has been submitted." *Id.* (citing Ex. B, Student Catalog at 60–61). Based on this language, the Court agrees with Defendant that this is "fatal to Plaintiff's breach of contract claim based on the Application for Degree Fee, as no possible reading could give rise to a promise [] of an in-person commencement in exchange for that fee." *Id.* at 14. The University's published language is unambiguous; it does not promise access to an in-person graduation, classes, or any other access to campus in exchange for the registration or graduation fees. In fact, it states there is *no fee* to participate in graduation in-person.

### C.  NSU Student Services Fee

Next, the Court addresses the Student Services Fee of $500. This fee, like the previously discussed fees, is identified on the Tuition and Fee Information webpage as a "University-wide Fee." *Id.* at 8 (citing Ex. A, Tuition and Fee Information). Defendant argues that this fee, along with the other University-wide fees, were not tied to in-person services or experiences because they were paid by "all NSU students," including students who originally registered for wholly virtual education prior to the campus shut-down. *Id.* In response to this argument, Plaintiff states, "[t]he prices set for fees paid by online-only students is an issue of fact that need not and should not be discussed at this juncture." Resp. at 7. The Court disagrees. At this juncture, the Court looks to the language used in the University's publications—as referenced by Plaintiff herself—to determine whether there are unambiguous terms. With regard to the University-wide fees, the Court agrees with Defendant.

The terms "all students" and "University-wide" unambiguously mean *all* students, across the entire University, regardless of educational method. It is unambiguous from the text that these fees, including the Student Services Fee, were payable by students regardless of whether they registered for face-to-face classes, online classes, or hybrid classes prior to the COVID-19

shutdown. Moreover, the Tuition and Fee Information webpage expressly states that the "Student Services Fee is used to *help offset university expenses* for classroom technology, labs, facilities, curriculum enhancements, parking technology, academic services, and other student services." Mot. at 11 (citing Ex. A, Tuition and Fee Information) (emphasis added in Motion). Fees paid to "help offset" the costs of programs, or "support" programs, are distinct from fees to provide "access" to campus. *See, e.g.*, *Fiore v. University of Tampa*, 568 F. Supp. 3d 350, 374 (S.D.N.Y. 2021) (student publications stated that Student Services Fee was to "support" certain programs and services, not provide "access"). Thus, the Student Services Fee was not set "based on the in-person educational services, opportunities, and experiences [NSU] was providing on campus," as Plaintiff alleges. Am. Compl. ¶ 36. Instead, the language of the University's webpage makes clear that the Student Services Fee was used to *help offset University expenses*. This language is straightforward, and its plain meaning must control. It does not support a promise that the Student Services Fee was paid in exchange for student access to campus.

### D.   *Science Lab and Music Fees*

The only fees remaining are not University-wide Fees, but rather specific fees Plaintiff paid for "Science Lab Chemistry B" ($80), "Science Lab" ($80), and "PVA Music" ($265). Am. Compl. ¶ 12. The parties raise multiple arguments regarding these specific fees. The most compelling, however, is that these three fees are blatantly education-related fees, which this Court barred in *Ferretti II*. As noted above, the Court already dismissed with prejudice "any claim for fees to the extent they were paid in exchange for in-person, on campus instruction." Order Lifting Stay ¶ 3. These lab and music fees Plaintiff paid are course-specific fees and therefore unambiguously education-related expenses for instruction. The University's Student Catalog includes a page titled, "Course-Specific Fee Chart 2019–2020." Mot. at 9–10 (citing Ex. B, Student Catalog at 77–78). The chart includes a list of over 100 courses and a fee associated with

each course ranging from $40 to $275. *Id.* The chart does not indicate that these fees were charged in exchange for any type of access to labs, music or performance spaces, or any other on-campus resource. Nor does Plaintiff identify any other document that makes such a promise. And that makes sense. Paying a fee for a specific course provides a student with the ability to take the course. These are not fees for unlimited lab time, unassociated with a specific course. These are not passes to access music practice rooms, unassociated with a specific course. On their face, these are fees students paid to take a course, and accordingly, these claims are based on repackaged education-related expenses that this Court has already dismissed.

In sum, the Court finds that Plaintiff has not identified specific contractual terms promising access to in-person, on-campus activities. Instead, the Mandatory Fees and University publications constitute a valid implied-in-fact contract for the following: (1) the insurance fee provided nation-wide insurance; (2) the registration and graduation fees allowed students to sign up for courses and process their application to graduate—not participate in graduation; (3) the student services fee helped off-set University expenses; and (4) the chemistry and music fees are education-related fees paid for specific science and music courses. The University publications unambiguously establish that the Mandatory Fees were untethered to accessing the campus. Accordingly, the Court need not reach Defendant's argument that Plaintiff has not established a material breach or actionable damages. The breach of contract claim is dismissed.

## II. Unjust Enrichment

Plaintiff brings an alternative claim for unjust enrichment. Defendant maintains that the Court should dismiss Plaintiff's unjust enrichment claim because (1) the Mandatory Fees and University Publications created an implied-in-fact contract between Plaintiff and the University which did not provide access to campus activities, facilities, resources, and services to Plaintiff,

and (2) Plaintiff has pleaded no facts that, if true, establish that it would be inequitable or unjust for the University to retain the Mandatory Fees. Mot. at 17.

The Court previously stated the relevant law on unjust enrichment in *Ferretti II*. Unjust enrichment may be properly pled where "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the conferred benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Gibson v. Lynn Univ.*, 504 F. Supp. 3d 1335, 1344 (S.D. Fla. 2020) (quoting *Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*, 1 So. 3d 400, 404 (Fla. 3d DCA 2009)). As the Court stated in *Ferretti II*, "[a]lthough a party may recover under an unjust enrichment theory only when there is no valid express or implied-in-fact contract, unjust enrichment and breach of contract may be pled in the alternative where one of the parties asserts that the contract governing the dispute is invalid." 604 F. Supp. 3d at 1338.

In *Ferretti II*, the Court "found a valid implied-in-fact contract which contemplated that Defendant may hold an unspecified portion of face-to-face classes online." *Id.* The Court concluded, "to the extent Plaintiff's unjust enrichment claim is based on the same subject matter as his breach of contract claim regarding in-person, on-campus classroom instruction, it cannot proceed." *Id.* However, since at that time, the Court did not find "unambiguous terms creating a valid contract for live campus access," the Court concluded it was "premature to dismiss Plaintiff's unjust enrichment claim as to Defendant's closure of access to campus activities, facilities, resources, and services." *Id.* (citing *Gibson*, 504 F. Supp. 3d at 1344; *Salerno v. Fla. So. Coll.*, 488 F. Supp. 3d 1211, 1218 (S.D. Fla. 2020); *Rosado v. Barry Univ.*, 499 F. Supp. 3d 1152, 1160 (S.D. Fla. 2020)). With this background in mind, the Court addresses Defendant's two arguments.

The Court agrees with Defendant's first argument. With respect to in-classroom instruction, the Court found in *Ferretti II* that there was an implied-in-fact contract that

unambiguously reserved to Defendant the discretion to hold an unspecified portion of face-to-face classes online. 604 F. Supp. 3d at 1338. Now, the Court has found a valid implied-in-fact contract between students and the University regarding the Mandatory Fees as well. Based on the University's publications, there is an implied-in-fact contract providing that the Mandatory Fees were explicitly to be used for purposes *other than access* to campus activities, facilities, resources, and services. Consequently, the Court agrees with Defendant that it must dispose of Plaintiff's unjust enrichment claims like it did in *Ferretti II* regarding the education-related expenses.

Plaintiff argues, however, that she is entitled at this stage to plead unjust enrichment in the alternative to breach of contract, even if the Court finds a valid contract exists. Resp. at 10. Plaintiff argues that even if the implied-in-fact contract was solely for the University to use the Mandatory Fees to off-set certain expenses, those expenses must have been lower due to the University's response to COVID-19, and it would therefore be "inequitable for Defendant to keep such a windfall." *Id.* at 10–11. Her Amended Complaint alleges, "[t]he cost associated with operating the University have [sic] been lowered due to their transitioning to online only education and services. For instance, the cost of staff, maintenance, utilities, and general overhead have decreased." Am. Compl. ¶ 77. However, as Defendants argue, "the fact remains that the unjust enrichment claim is intrinsically linked to the subject matter of the contract." Reply at 9. At their core, both the breach of contract and unjust enrichment claims arise from the University's retention of the Mandatory Fees paid by students in the Winter Semester. Because her unjust enrichment claims are based on the same subject matter, they cannot proceed. *See id.*

The Court also agrees with Defendant's second argument on unjust enrichment. Plaintiff has pled no facts that, if true, establish that it would be inequitable or unjust for the University to retain the fees. No fact alleged supports a finding that the University retained any fees that it did not use for the purpose intended (*e.g.*, to offset expenses, provide health insurance, register for

classes, or graduate from the University). The Amended Complaint also does not allege that the University enjoyed any windfall by transitioning to remote services. The allegation that the University's "cost of staff, maintenance, utilities, and general overhead have decreased" (Am. Compl. ¶ 77) does not carry the weight of Plaintiff's unjust enrichment claim. *See, e.g.*, *Fiore*, 568 F. Supp. 3d at 376 (dismissing unjust enrichment claim upon noting that the plaintiffs "have only alleged that the fees were meant to support programs that Defendant offered. Absent nonconclusory allegations that the fees did not go toward their intended purpose, Plaintiffs have not adequately pleaded circumstances in which it would be inequitable for Defendant to retain such fees."). For each of these reasons, the Court dismisses the unjust enrichment claim.

## **CONCLUSION**

Plaintiff was provided an opportunity to plead facts alleging there was an implied-in-fact contract where Plaintiff paid Mandatory Fees in exchange for access to the University's campus. But the opposite is true. The Court finds that University publications show there was an implied-in-fact contract addressing each of the six mandatory fees Plaintiff has identified—but none of these fees were paid in exchange for campus access. Thus, the Court must dismiss Plaintiff's breach of contract claim. Relatedly, given the existence of an unambiguous implied-in-fact contract involving the exchange of fees for services other than campus access, Plaintiff's unjust enrichment claim also fails. And Plaintiff has not established the University used the income from Mandatory Fees for anything other than what it promised in the implied-in-fact contract. Based on the foregoing, the Court need not address Defendant's remaining claims regarding standing and attorneys' fees.

The Court concludes that this chapter of ongoing litigation seeking to hold Nova Southeastern University liable for breach of contract or unjust enrichment following its campus closure at the start of the COVID-19 pandemic has come to an end. Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss, [ECF No. 30], is **GRANTED.**

2. Plaintiff's Amended Complaint is **DISMISSED** *with prejudice.*

3. The Clerk is instructed to **CLOSE** this case.

**DONE AND ORDERED** in Miami, Florida, this 23rd day of May, 2023.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**